THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* LaQUAN LOVE SMITH, Defendant-Appellant.

Second District    No. 79-416

Opinion filed February 9, 1981.

Mary Robinson and David S. Morris, both of State Appellate Defender's Office, of Elgin, for appellant.

28

William E. Sisler, State's Attorney, of Freeport (Phyllis J. Perko and Cynthia N. Schneider, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mr. PRESIDING JUSTICE SEIDENFELD delivered the opinion of the court:

LaQuan Love Smith, the defendant, was convicted of armed robbery in a bench trial and sentenced to 11 years' imprisonment. He appeals, contending that the testimony of the psychiatrist who had previously examined him for competency to stand trial violated his patient-therapist privilege; and also that the psychiatrist was erroneously permitted to base his opinion upon hearsay. He also claims ineffective assistance of counsel.

On March 20, 1978, the defendant was charged in a Stephenson County information with the offense of armed robbery of Baker's West Motel on February 7, 1978. Also filed on that date was defendant's petition for a psychiatric examination. A competency hearing was held on June 26, 1978, after which the court found the defendant unfit and remanded him to the Illinois Security Hospital at Chester.

On March 1, 1979, a new hearing was ordered to determine the fitness of the defendant to stand trial, wherein the defense counsel stipulated that defendant was at that time fit to stand trial.

At trial, Mrs. Baker testified that the defendant and his co-defendant checked into the Baker's West Motel at approximately 7 a.m. on February 7, 1978. The defendant signed the registration card with an assumed name and placed upon that card the license number of his car. The car was an orange Gremlin. At approximately 10 p.m. on that night, the two men came in and requested their bill. At this time, defendant grabbed Mrs. Baker and put a knife to her neck. His co-defendant also brandished a knife and demanded the office money. Mrs. Baker gave the two men the money in the drawer as well as the yellow bank envelope. The foregoing was observed by Baker's daughter, who told her father and thereafter called the police. Mr. Baker ran to investigate but was told by the co-defendant to "play it cool." Mr. Baker, however, observed both men in possession of knives. He then ran back to obtain a rifle.

After Mrs. Baker had given the defendant the cash, the defendant forced Mrs. Baker out of the door after the co-defendant. At some point, Mrs. Baker broke loose and ran back to the motel office. At the doorway she met her husband, who was then in possession of his rifle. Mr. Baker and the daughter observed the two fleeing from the motel in the orange Gremlin headed west.

Three police officers testified to the chase and interception of the vehicle. One, Officer Peterson, testified that he observed two objects fly out of the car just before the car was stopped. The items thrown out of the

window of the car included two knives later identified by Mrs. Baker as the knives used in the robbery, and a money bag containing checks taken in the robbery. Another officer testified that he observed the red mark on Mrs. Baker's throat where the defendant had held his knife.

The defendant began his defense with the testimony of Dr. William Gould, a certified psychologist who examined the defendant on May 3, 1978, to determine the defendant's fitness to stand trial. Dr. Gould examined the defendant for approximately an hour to an hour and a half, during which time he conducted several psychometric tests. Dr. Gould testified that the defendant performed poorly on all of those tests. He also testified that defendant was hearing voices during the interview. He concluded that the defendant was a schizophrenic individual.

A second psychologist, Dr. Graybill, testified that he examined the defendant on three separate occasions pursuant to court order in order to determine whether or not the defendant was fit to stand trial. On the first date, the doctor found the defendant to be grossly delusional and hallucinating. Dr. Graybill also interpreted the results of the tests performed by Dr. Gould to indicate that the defendant had no reality boundaries at all. Dr. Graybill did not believe that the defendant was faking the results of these tests. After the first interview, Dr. Graybill diagnosed the defendant as a "deteriorating schizophrenic." Dr. Graybill noted that the defendant had made an attempt to commit suicide while in jail. After the second interview, Dr. Graybill still maintained that the defendant was unfit to stand trial. The doctor ultimately determined that the defendant was legally insane at the time he committed the crime.

The defendant was also interviewed by Dr. Hamann, who also testified at trial concerning the defendant's sanity. This doctor concluded that the defendant was suffering from "schizophrenic psychosis." Dr. Hamann first concluded that the defendant was not fit to stand trial. He also concluded that the defendant was legally insane at the time he committed the crime.

The State then called Officer William Bland as a rebuttal witness. Bland testified that he had a contact with the defendant during the course of the investigation and that during this time he did not perceive any sort of mental problem. On cross-examination, however, Bland did admit that when the defendant was read his rights on February 9, 1978, he spoke some words "that sounded like French." Officers Lou Palmeri and James Teasdale, as well as Walter J. Smith, the day supervisor for the Winnebago County jail, also testified that the defendant had not engaged in any unusual behavior during the time they had contact with him.

The State then offered the testimony of Matthew D. Parrish, the superintendent of the Singer Mental Health Center, who was asked to interview the defendant by jail authorities on May 31, 1978, prior to the

first competency hearing, in order to determine whether the defendant would be appropriate as a patient for either the Singer Center or some other institution operated by the Department of Mental Health. Parrish testified that he first informed the defendant of his rights before conducting his examination. Dr. Parrish came to the conclusion that the defendant was exaggerating his condition and that his mental disturbances may have been caused by certain drugs. He saw no evidence that the defendant was schizophrenic. Dr. Parrish testified that the best evidence of the defendant's state of mind at the date of the offense would be evidence as to the defendant's conduct at the time he committed the crime. The doctor testified that he had read the police reports and the statements of witnesses. From these he concluded that the defendant was not psychotic at the time of the crime and that he was legally sane. At this time, the defense counsel objected to the doctor's testimony on the ground that the doctor had never been ordered by a court to determine the sanity of the defendant. The counsel's objection was overruled.

In his closing argument, the prosecutor emphasized the opinion given by Dr. Parrish and the fact that that opinion was based on the police records. On May 21, 1979, the court found that the defendant was legally sane beyond a reasonable doubt and therefore found the defendant guilty of armed robbery.

■■ We must first consider an issue of waiver raised by the State. A specific objection to Dr. Parrish's testimony was not made until the witness had given his conclusion that defendant was not insane at the time of the commission of the crime. Counsel for the defendant then stated that he was objecting to the conclusion of the witness because he was never "ordered or asked" to determine defendant's fitness to stand trial but merely to determine the best place for treatment. The question of privilege now raised on appeal was not referred to at trial and defendant filed no post-trial motion. Issues not raised in a post-trial motion "are effectively waived for appellate review." (*People v. Tannenbaum* (1980), 82 Ill. 2d 177, 181.) Generally, the failure to object at trial operates as a waiver of consideration of the issue on appeal. (*People v. Carlson* (1980), 79 Ill. 2d 564, 576.) In absence of objection a reviewing court may consider the issue if it amounts to "plain error." (Ill. Rev. Stat. 1979, ch. 110A, par. 615(a).) However, the doctrine of "plain error" is a limited exception to the waiver rule applied to correct "grave errors" (*People v. Tannenbaum*, at 182) or where the case is close factually and the trial error is so prejudicial that real justice has been denied. *People v. Carlson* (1980), 79 Ill. 2d 564, 576-77.

We conclude that defendant's claim that the testimony of Dr. Parrish was erroneously admitted based on the patient-therapist privilege is not meritorious.

Defendant claims that the statements made to Dr. Parrish were confidential under the Mental Health and Developmental Disabilities Confidentiality Act. (Ill. Rev. Stat. 1979, ch. 91½, par. 801 *et seq*.) The effective date of the Act is January 9, 1979. The interview with Dr. Parrish occurred on May 31, 1978. The trial occurred in May 1979. Thus, there is some question as to the applicability of the statute. However, this is not important since a predecessor statute (Ill. Rev. Stat. 1977, ch. 51, par. 5.2) is similar in most significant respects. Both statutes give the patient or the therapist, on behalf of the patient, the right to assert a privilege to prevent disclosure of the patient's confidential communications. Par. 5.2 requires that the communications must relate "to diagnosis or treatment of the patient's mental condition" and be directed towards "the objectives of diagnosis or treatment." Section 2(1) of the Mental Health and Developmental Disabilities Act defines communications as:

"* * * [A]ny communication made by a recipient or other person to a therapist or to or in the presence of other persons during or in connection with providing mental health or developmental disability services to a recipient." (Ill. Rev. Stat. 1979, ch. 91½, par. 802(1).)

It further defines mental health services in subsection 3 to include "examination, diagnosis, evaluation, treatment, training, pharmaceuticals, aftercare, habilitation or rehabilitation." Section 2(6) of the Mental Health and Developmental Disabilities Confidentiality Act defines recipient as a person who is receiving or has received mental health or developmental disabilities services. (Ill. Rev. Stat. 1979, ch. 91½, par. 802(6).) Patient is defined in section 5.2 of the Evidence Act (Ill. Rev. Stat. 1977, ch. 51, par. 5.2) as "a person who for the purpose of securing diagnosis or treatment of his mental condition consults a psychiatrist." Dr. Parrish was clearly engaged in diagnosis of the defendant, which is included in each of the statutes.

Each statute also contains stated exceptions to the privilege. In section 5.2 the relevant exception reads:

"(b) if the judge finds that the patient, after having been informed that the communications would not be privileged, has made communications to a psychiatrist in the course of a psychiatric examination ordered by the court, * * *." (Ill. Rev. Stat. 1977, ch. 51, par. 5.7.)

In section 10 of the Mental Health and Developmental Disabilities Act, the relevant exception is:

"(4) Records and communications made to or by a therapist in the course of examination ordered by a court for good cause shown may, if otherwise relevant and admissible, be disclosed in a judicial or administrative proceeding in which the recipient is a party

\* \* \*, provided such court has found that the recipient has been as adequately and as effectively as possible informed before submitting to such examination that such records and communications would not be considered confidential or privileged."

■■ ■ The admission of the testimony could not possibly be reversible error because of the patient-therapist privilege. The privilege must be asserted by either the defendant or the therapist or it is considered waived. (*Rowley v. Rousseau* (1980), 81 Ill. App. 3d 193, 199; *People v. White* (1970), 131 Ill. App. 2d 652, 655; McCormick, Evidence §103, at 221-22 (2d ed. 1972).) The defendant did not object to the evidence on the basis of privilege; therefore, the privilege has been waived. The failure to exercise the privilege is not plain error, since to so hold would void the right of a party to voluntarily waive the privilege.

■■ We also do not find plain error in defendant's contention made for the first time on appeal that admission of the testimony of Dr. Parrish constituted prejudicial error because it was based on alleged hearsay contained in police reports. Generally, police reports are not admissible into evidence. (See, *e.g.*, *People v. Richardson* (1977), 48 Ill. App. 3d 307, 310.) Also, generally, an expert witness must base his opinion on facts properly in the record except that an expert medical opinion on sanity may be based on materials commonly used by the medical profession. (*People v. Ward* (1975), 61 Ill. 2d 559, 568.) In *People v. Isenberg* (1978), 60 Ill. App. 3d 325, 329, the examining psychiatrist testified that he had read the police reports and the witness' statement and relied on them indirectly in determining the competence of the defendant. The appellate court held that since the reports merely confirmed the defendant's statements to the doctor which were in evidence, the trial court did not abuse its discretion in denying defendant's motion to strike the testimony. 60 Ill. App. 3d 325, 329-30.

■■ Here, Dr. Parrish relied extensively on the statements in the police reports concerning defendant's actions during the commission of the crime in determining his sanity. However, it appears from the testimony that the information contained in the police reports and the witness' statements were accurate and were corroborated in a large extent by testimony that was adduced at trial. In addition, defendant's right to confront witnesses was not abridged by the doctor's reliance on the police reports, and all of the witnesses who had contributed to the reports testified at trial. We find no plain error in this case. The victim and other witnesses testified that the defendant acted rationally during the commission of the crime, and police officers testified as to the rationality of the defendant during his arrest and questioning. Since the trial court could have found the defendant sane on the basis of this testimony alone, we conclude that there was no grave error and that fundamental fairness or

the interest of justice does not require a reversal under the limited exception of the waiver rule characterized as "plain error." See *People v. Deizman* (1976), 44 Ill. App. 3d 829, 833-34; *People v. Spears* (1978), 63 Ill. App. 3d 510, 519. See also *People v. Young* (1978), 60 Ill. App. 3d 351, 353-54.

Defendant's contention that his counsel was incompetent is also based on the failure of counsel to object on privilege or hearsay grounds to the testimony of Dr. Parrish.

■■ The standard for establishing ineffective assistance of appointed counsel is actual incompetence reflected in the performance of his duties as trial attorney producing substantial prejudice without which the result of the trial would probably have been different. (*People v. Greer* (1980), 79 Ill. 2d 103, 120-21.) Proof of prejudice may not be based upon conjecture or speculation as to the outcome of the case if defendant had received better representation. (*People v. Hills* (1980), 78 Ill. 2d 500, 505-06.) Further, if the alleged incompetency is purely a matter of professional judgment it does not support a claim of ineffective representation. *People v. Haywood* (1980), 82 Ill. 2d 540, 543-44.

We conclude that the failure to assert defendant's alleged patient-psychiatrist privilege was not incompetence of counsel within the accepted definitions. First, when Dr. Parrish interviewed defendant he advised him of "his rights." The doctor stated that defendant did not talk about the crimes. It is to be noted in this connection that section 5.2(a) of the statute in effect at the time of the interview provides, as to court-ordered examination, that if the psychiatrist informs the patient that any communication would not be privileged if made, there is no privilege as to following communications. (Ill. Rev. Stat. 1977, ch. 51, par. 5.2(b).) Arguably, since the privilege is completely statutory, it may not apply to the examination made by Dr. Parrish which was at the direction of jail authorities who called him because the defendant appeared in need of treatment. However, even if, as a matter of fundamental fairness, the privilege is applicable to non-court-ordered examinations, the purpose of the exception has been satisfied. The essence of the exception is that a defendant be made aware that any statement made to the psychiatrists will be confidential so that he can offer any information to the doctor with complete candor. Thus, the psychotherapeutic treatment may be most effective. (See *Laurent v. Brelji* (1979), 74 Ill. App. 3d 214, 217.)

Under the facts before us the defendant did not have expectation of confidentiality when he was told prior to the examination, in essence, that it could be used against him.

■■ ■ Even assuming that the statements made by the defendant to the psychiatrist were privileged, the failure to specifically object did not constitute ineffective assistance of counsel. First, an objection would not

have precluded the doctor from testifying completely. The patient-therapist privilege operates as a bar to the disclosure of confidential communications so that the defendant could only object to the disclosure of such communications between himself and the therapist. However, by the time of trial Dr. Parrish had read the results of the tests performed by Dr. Gould and had access to copies or photocopies of results or reports prepared by Dr. Graybill and Dr. Hamann. It is clear that a psychiatrist testifying at trial need never have interviewed the defendant in order to develop an opinion as to defendant's sanity at the time of the commission of the crime. (See *People v. Newbury* (1972), 53 Ill. 2d 228, 236.) In fact, a psychiatrist can testify purely in answer to a hypothetical question incorporating all the facts and evidence. Here it is clear from the basis of the doctor's opinion, which was that the most important information in determining the defendant's sanity at the time of the commission of the crime is the actions of the defendant during the commission of the crime, that the doctor could have given the same testimony concerning defendant's sanity without ever revealing a record or a confidential communication. Thus, there was an independent basis for the determination of the defendant's sanity.

Moreover, defense counsel did make the objection at trial that the examination was not for the purpose of rebutting an insanity defense. His failure to make the more specific objection which is asserted on appeal does not lead us to conclude that the outcome would probably have been different if the specific objection had been made. In the sentencing hearing the trial judge indicated that he felt the testimony of the psychiatrist was inconclusive, that the acts of the defendant at the time and place in question were the acts of an individual who had motive and was rational, but that he did rely on the testimony of Dr. Parrish to the effect that the hallucinations were caused by voluntary injection of narcotic drugs. We cannot conclude that the judge as the trier of the facts would have come to a different determination concerning the defendant's sanity if Dr. Parrish had not testified.

The judgment is affirmed.

Affirmed.

NASH and UNVERZAGT, JJ., concur.