THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. SEDWRICK TORRY, Defendant-Appellant.

First District (1st Division)   No. 1—86—2847

Opinion filed April 8, 1991.—Rehearing denied May 7, 1991.

Randolph N. Stone, Public Defender, of Chicago (Andrea Monsees, Assistant Public Defender, of counsel), for appellant.

Cecil A. Partee, State's Attorney, of Chicago (Renee Goldfarb, Kenneth T. McCurry, and Walter P. Hehner, Assistant State's Attorneys, of counsel), for the People.

JUSTICE O'CONNOR delivered the opinion of the court:

Defendant Sedwrick Torry appeals from his conviction and sentence for the murder of Renee Ballard.

We affirm in part and vacate in part.

Sometime in the early morning hours of June 14, 1984, Renee Ballard and her five-year-old son, Lavell, were stabbed to death in the apartment Ballard shared with Robert Brandon, defendant's brother. Defendant was arrested later that morning. He subsequently gave oral and written statements to police in which he admitted stabbing Ballard during an argument. Following a bench trial in which defendant's written statement was admitted into evidence, defendant was convicted of murdering Ballard, but was acquitted of murdering her son.

Additional facts pertinent to disposition of the issues raised on appeal are summarized below within the context of our consideration of those issues.

I

Prior to trial, defendant was examined by Dr. Robert A. Reifman, director of the Psychiatric Institute of the Cook County circuit court, pursuant to a court order, to determine whether defendant was mentally fit to stand trial. Reifman concluded defendant was fit and communicated that opinion to the court in a letter dated February 27, 1985.

A fitness hearing was subsequently held. Reifman testified as the sole witness based upon an interview he conducted with defendant and his review of reports of two psychologists, Holub and Kamer, EEG test results, reports of two other doctors, Rabin and Stipes, and police reports.

Reifman testified defendant understood the proceedings and the charges against him, the consequences of a judgment and sentence, the functions of the participants, and was able to recollect and repeat the occurrences involved within acceptable limits. Although defendant appeared "somewhat slow and depressed," Reifman concluded defendant was fit to stand trial.

Reifman believed defendant exhibited a selective memory. Reifman noted a report of Holub and Kamer indicated defendant remembered certain facts surrounding Ballard's murder. He remembered being at Ballard's apartment and using certain drugs. He remembered that the police arrived, and that, after his arrest, the police failed to advise him of his constitutional rights. However, defendant had represented to Reifman that he could not recall anything he had earlier told Holub and Kamer.

Reifman explained that, even if defendant truly experienced memory difficulties, Reifman would have expected defendant to be able to remember facts he had earlier recounted. Reifman therefore con-

cluded defendant was lying about his inability to remember and that that suggested his mental fitness.

On appeal, defendant argues Reifman's testimony lacked an adequate foundation because Reifman did not sufficiently identify the materials he relied upon in forming his opinion or establish they were either independently admissible or of a type reasonably relied upon by experts in the particular field. Without an adequate foundation, defendant contends, Reifman's testimony should have been excluded.

█ █ We do not agree. Pursuant to the adoption of Federal Rules of Evidence 703 and 705 in Illinois (*Wilson v. Clark* (1981), 84 Ill. 2d 186, 417 N.E.2d 1322, *cert. denied* (1981), 454 U.S. 836, 70 L. Ed. 2d 117, 102 S. Ct. 140), the constraints on eliciting an expert's opinion have been considerably loosened. Experts are permitted to give their opinion without prior disclosure of underlying facts or data. (*Wilson*, 84 Ill. 2d 186, 417 N.E.2d 1322, *cert. denied* (1981), 454 U.S. 836, 70 L. Ed. 2d 117, 102 S. Ct. 140.) Even materials otherwise substantively inadmissible may be admitted into evidence for the limited purpose of explaining the basis for an expert's opinion, where other experts in the particular field reasonably rely on such materials. (*People v. Anderson* (1986), 113 Ill. 2d 1, 495 N.E.2d 485, *cert. denied* (1986), 479 U.S. 1012, 93 L. Ed. 2d 713, 107 S. Ct. 658; *Wilson*, 84 Ill. 2d 186, 417 N.E.2d 1322, *cert. denied* (1981), 454 U.S. 836, 70 L. Ed. 2d 117, 102 S. Ct. 140.) The burden is placed on the adverse party to elicit facts underlying the expert's opinion. *Wilson*, 84 Ill. 2d 186, 417 N.E.2d 1322, *cert. denied* (1981), 454 U.S. 836, 70 L. Ed. 2d 117, 102 S. Ct. 140.

█ In the instant case, the State was simply not required to elicit, from Reifman, the basis for his opinion. Defendant's counsel bore that burden in challenging Reifman's testimony during cross-examination. Further, there is no question but that Reifman properly could have utilized the reports of Holub, Kamer, Rabin, and Stipes, and defendant's EEG test results in forming his opinion. Reports and test results of previous examinations of an individual by medical professionals are clearly materials relied upon by others in the same field to formulate opinions regarding that same individual.

█ Although we cannot conclude Reifman's reliance on police reports can be similarly justified, we do not find the admission of his testimony related thereto constitutes reversible error. Reifman's opinion that defendant was lying about his inability to remember, which in part supported the determination of defendant's fitness, was based on Reifman's analysis of defendant's earlier recounting of particular events of January 14, 1984, contained in the report of Holub and Ka-

mer. The record indicates Reifman relied on the police reports for the same purpose. Because Reifman's conclusion that defendant selectively remembered events did not depend on Reifman's testimony related to the police reports alone, we conclude admission of that testimony was harmless. See *People v. Smith* (1981), 93 Ill. App. 3d 26, 416 N.E.2d 814.

Defendant also argues that the letter stating Reifman's opinion that defendant was mentally fit to stand trial failed to comport with the statutory requirements of an examiner's report under section 104—15 of the Code of Criminal Procedure of 1963, because it did not contain a diagnosis and supporting information. Ill. Rev. Stat. 1983, ch. 38, par. 104—15.

■ Even accepting defendant's argument, we do not conclude that that failure here could affect Reifman's testimony. The report is required only in conjunction with the prehearing examination of a defendant to determine if a *bona fide* doubt as to fitness exists. (Ill. Rev. Stat. 1983, ch. 38, par. 104—11; see also Ill. Rev. Stat. 1983, ch. 38, par. 104—16(a).) We do not understand how the letter's failure to comport with the requirements of section 104—15 could affect the determination of fitness in light of the subsequent hearing on the issue.

Defendant lastly contends Reifman's testimony was insufficient to establish defendant's fitness by a preponderance of the evidence. Ill. Rev. Stat. 1983, ch. 38, par. 104—11(c).

■ Only Reifman testified regarding defendant's fitness to stand trial. Defendant stipulated as to Reifman's qualifications as an expert in psychiatry for that purpose. Reifman testified that defendant was aware of the nature and consequences of the proceedings. Reifman concluded defendant did not suffer from any organic disorder which would render defendant unfit for trial. Instead, based on Reifman's interview with defendant, as well as review of defendant's previous interviews with others, Reifman testified defendant was untruthful about his inability to remember, indicating defendant was mentally fit. Defendant called no witnesses to rebut Reifman's testimony. Based on Reifman's testimony, we are satisfied defendant's fitness was established by a preponderance of the evidence.

## II

In pretrial motions, defendant sought to quash his arrest and to suppress a pair of blue jeans and a shirt recovered from his mother's apartment on the grounds that the police lacked the requisite consent to enter and search the premises.

The following pertinent testimony was adduced regarding consent.

Mark Hawkins, a Chicago police officer, testified that he, along with his partner, Kevin McDonald, and Detectives Jimmy Johnson and William Barker, went to defendant's mother's apartment at 5 a.m. on June 14, 1984, based on information that defendant was there. They did not have an arrest or a search warrant. The officers were in uniform and arrived in a marked squad car.

Upon their arrival, he and Johnson went to the front door and knocked. Hawkins stated defendant's sister Olivia answered. Olivia stated defendant had been there at approximately 3 a.m. that morning, had changed clothes, and had left. Olivia told police defendant had had blood on his clothing, but it did not appear he had been injured. Hawkins testified Olivia told the police they could look for defendant in the house. Hawkins could not remember whether either he or the detective with him had their weapons drawn when they entered.

Two young boys also present told the police that defendant had come in with blood on his clothing, washed his clothes in the bathroom, changed, and left.

Hawkins recovered a pair of blue jeans from a bathroom and a purple shirt from the back porch. Both articles were wet with water and blood.

Olivia Minnifield, defendant's sister, testified that on the morning the police arrived, she was lying on a couch near the door when she heard a knock. She did not answer the door. She stated the police entered the apartment and eventually left with some clothes. She testified that she did not hear the police ask for permission to enter the apartment or ask for permission to take the clothes.

During cross-examination, Olivia remembered that the police had said they were looking for defendant.

Defendant's mother, Amanda Archie, testified she accompanied the police to her apartment when they went to look for defendant. She had to knock at the door because she did not have her keys with her. Her daughter answered the door, and the police "barged right in" without asking whether they could enter. She stated the police told her they could enter because they were looking for defendant.

Hawkins testified in rebuttal that the police were unaccompanied by any civilian when they went to the apartment that morning.

Defendant contends the State failed to show the entry was consensual and that the subsequent seizure of defendant's clothing was untainted by the illegal entry. Rather, defendant argues, consent was

given only in acquiescence to police authority. Defendant notes the officers were in uniform and observes Hawkins could not recall whether he or the detective with him had a weapon drawn.

■ It is undisputed that early in the morning of June 14, 1984, two uniformed police officers and two detectives arrived at defendant's mother's apartment, looking for defendant. There was a knock at the door, the police subsequently entered, and retrieved a pair of blue jeans and a purple shirt. Beyond those circumstances, the determination of consent here must rest on the trial judge's assessment of the witnesses' credibility. The record indicates that the trial judge resolved that issue in favor of the State, determining that voluntary consent was given to the police to enter and search for defendant. Because of his superior position in making that assessment, we must defer to the trial judge's finding, absent an indication in the record that the decision was manifestly erroneous. *People v. Neal* (1985), 109 Ill. 2d 216, 486 N.E.2d 898.

The hour the police arrived and the fact that two of the four officers were in uniform are factors to consider in assessing the totality of circumstances to determine voluntariness of the consent. (See *People v. Froio* (1990), 198 Ill. App. 3d 116, 555 N.E.2d 770.) However, we find those facts, alone, provide insufficient basis to disturb the trial judge's determination arrived at after having had the opportunity to view the witnesses' testimony. Further, we decline to accept defendant's interpretation of Hawkins' stated inability to remember whether he or the detective with him had a weapon drawn to be an admission of either possibility. The only reasonable conclusion to be drawn from Hawkins' statement is that he could not remember. Notably, neither defendant's sister nor his mother testified that either officer had his weapon drawn.

■ We also determine that the record supports the seizure of defendant's clothing under the plain view exception to the warrant requirement based upon the lawful entry and search for defendant. (See *Horton v. California* (1990), 496 U.S. 128, 110 L. Ed. 2d 112, 110 S. Ct. 2301.) Testimony established that defendant's clothing was recovered from a bathroom and back porch, both locations in which the police could reasonably have expected to find defendant.

### III

In a further pretrial hearing, defendant sought to suppress his statement in which he admitted stabbing Ballard. During that hearing, Chicago police detective Michael Herigodt admitted that, at some point during his interview with defendant on June 14, 1984, after he

had advised defendant of his constitutional rights, he told defendant that blood, which Herigodt believed to be from both victims, was found on defendant's clothing. Herigodt stated he had received that information from Detective William Johnston, relative to completed laboratory tests.

At trial, Pamela Ann Fish, a police criminologist, testified regarding various blood samples collected in conjunction with the investigation. Fish stated Lavell Ballard's blood type was Type O. However, defendant's blue jeans and shirt contained only Type B blood. Fish testified she had not told any person from the police department that she had discovered blood consistent with Lavell Ballard's type on defendant's clothing.

Mary Ann Furlong, a police serologist, testified she did not find blood enzymes particular to Lavell Ballard present in blood extracts taken from defendant's clothing. Furlong could not remember whether or not she ever conveyed that information to the police.

Defendant contends that, because Fish and Furlong testified they did not indicate to police that Lavell Ballard's blood was discovered on defendant's clothing, Herigodt misrepresented that fact to defendant. And, because defendant's incriminating statement followed Herigodt's questioning regarding the blood, defendant's confession was therefore coerced.

■ First, the record does not conclusively support the assertion that Herigodt made a knowing misstatement to defendant regarding the presence of both victims' blood on his clothing. Only Fish positively testified that she did not tell police that blood, consistent with Lavell Ballard's type, was found on defendant's clothing. Furlong did not remember whether she conveyed information to police regarding the presence of Lavell Ballard's blood on defendant's clothing. Although Herigodt did admit he told defendant both victims' blood was found, Herigodt stated that information came from Johnston. In his own testimony, Johnston stated merely that he had had the laboratory report on June 15, 1984. There is no clear indication in the record that Herigodt was told Renee Ballard's blood, but not Lavell Ballard's blood, had been discovered on the clothing.

■ More importantly, even accepting defendant's argument, no basis for reversal exists. Police deception is only one of the relevant factors to consider in determining whether a confession has been voluntarily given. (*People v. Martin* (1984), 102 Ill. 2d 412, 466 N.E.2d 228, *cert. denied* (1984), 469 U.S. 935, 83 L. Ed. 2d 270, 105 S. Ct. 334.) Misrepresentation is insufficient, alone, to invalidate a knowing waiver of constitutional rights and a subsequent voluntary statement.

*People v. Holland* (1987), 121 Ill. 2d 136, 520 N.E.2d 270, *aff'd* (1990), 493 U.S. 474, 107 L. Ed. 2d 905, 110 S. Ct. 803.

Here, the record indicates defendant was advised of his constitutional rights at the time of his arrest, prior to each of his interviews, and prior to making his oral and written statements. The record indicates that defendant acknowledged he understood those rights and voluntarily made a statement regarding the incident to police. Even assuming the police knowingly misrepresented to defendant that Lavelle Ballard's blood was found on his clothing, we do not believe that misrepresentation is sufficient to disturb defendant's conviction here.

## IV

At trial, the State established, through the testimony of Jordan Moss, that defendant was at Ballard's apartment prior to the murders. Moss testified he had been with defendant during the late evening of June 13, 1984, and had dropped defendant off at Ballard's apartment at approximately 12 or 12:30 a.m. on June 14, 1984, before returning home. Shortly after he arrived home, he was arrested and held in police custody for nine hours.

During cross-examination, defendant's counsel attempted to demonstrate Moss' bias against defendant by eliciting from Moss that, at the time of his arrest, Moss was angry at defendant for causing Moss' detention. The trial judge sustained the State's objections to that questioning.

Defendant now asserts that, by precluding that line of questioning, the trial judge deprived defendant of the opportunity to properly confront Moss.

■■■ The record indicates that the trial judge only sustained the State's objections to defense counsel's questions related to whether Moss was angry as of the time of his detention by police. Counsel was permitted to ask whether Moss harbored anger toward defendant as of the time Moss testified. Moss answered no. Because counsel was permitted to inquire as to Moss' motive for testifying against defendant as of the time of trial, the relevant time frame for assessing bias, we are not persuaded by defendant's argument and do not find defendant was prejudiced by the trial judge's limitation of Moss' cross-examination. See *People v. Halteman* (1956), 10 Ill. 2d 74, 139 N.E.2d 286.

## V

Over the objections of defense counsel, the trial judge permitted

the State to elicit Pamela Ann Fish's testimony regarding tests she performed on vaginal, rectal, and oral swabbings of Ballard's body for the presence of semen. Fish established that the vaginal swabbing tested positive, but could not determine the age of the sperm present.

Defendant contends that it was error to permit Fish to testify regarding the presence of semen because that evidence was irrelevant to the murder charge. Defendant points out he was not charged with a sexual offense. Further, because the age of the sperm could not be determined, no inference could be drawn that sexual intercourse played any role in the events surrounding Ballard's murder.

■■■ We agree Fish's testimony should not have been admitted. Nevertheless, the admission of that testimony appears insufficient to disturb the judgment against defendant. The record does not indicate the trial judge relied in any way on that testimony in finding defendant guilty. In light of the evidence presented at trial, including defendant's statement, we deem the error harmless. See *People v. Taylor* (1984), 101 Ill. 2d 508, 463 N.E.2d 705, *cert. denied* (1984), 469 U.S. 866, 83 L. Ed. 2d 140, 105 S. Ct. 209.

## VI

At trial, through the testimony of Anterior Charles, a friend of Robert Brandon, defendant's brother, defendant attempted to establish that Ballard was the aggressor in the fight during which she was stabbed. Charles stated that on June 13, 1984, he had been with Ballard at her apartment. At some point, Ballard left the apartment, giving him the apartment keys. He later met Ballard at her grandmother's house. Apparently there, Charles and Ballard each took a pill containing codeine and drank cough syrup. He stated that after Ballard drank the syrup, she became angry.

Charles returned to Ballard's apartment with a woman at approximately 5 p.m. He testified he knew Ballard had a gun and also kept an ivory-handled knife in her bedroom. Charles stated he saw the knife on the headboard in the bedroom when he had been in the room with the woman who accompanied him to the apartment.

Charles later accompanied Amanda Archie when she posted bail for her son, Robert Brandon. He and Brandon had discovered the victims' bodies upon their return. Charles stated that after they discovered the bodies, he saw Brandon remove a bottle of cough syrup from a purse on a dresser in the bedroom. Charles testified that the bottle of syrup was not full.

On cross-examination, Charles stated he did not remember having told police that Ballard had given him her apartment keys at a loca-

tion other than her apartment while she was sitting in a car with another man. Charles also stated he did not remember whether he told the police about Brandon and the purse or about seeing the knife earlier.

In rebuttal, the State presented a stipulation that either Officer Johnston or Detective Ernest Halverson would testify that they had a conversation with Charles on June 14, 1984, in which he told them that, in the early evening of the previous day, he had seen Ballard in the vicinity of her mother's house and that she had given him the apartment keys while she was sitting in an automobile with a man. Furthermore, the officers would testify that Charles stated he went to Ballard's apartment at approximately 11:40 p.m. on June 13, 1984.

Defendant contends the State improperly engaged in innuendo during its cross-examination of Charles by suggestion that Charles had given police a different explanation of where he obtained the apartment keys from Ballard. Defendant argues further improper innuendo attached to Charles when the State was permitted to ask Amanda Archie whether she had ever told the police that Charles was her boyfriend.

We do not conclude the State's questioning of Charles was improper. During his cross-examination, Charles answered he could not remember telling police that Ballard had given him the apartment keys at a different time, and at a different location, from what he indicated in his direct testimony. Through the stipulated testimony, the State properly attempted to impeach Charles by establishing Charles told police he was at Ballard's apartment at a later time than when he stated he saw the knife in Ballard's bedroom. Nor do we find the State's questioning of Amanda Archie to be improper. There is sufficient basis in the record to support a reasonable belief that Charles might have been Archie's boyfriend, justifying the limited questioning by the State in an attempt to show Charles' bias.

## VII

Defendant's written statement, in which defendant indicated he had been advised of, and understood, his constitutional rights, was admitted into evidence. Defendant's statement recounts that, at approximately 10:30 p.m. on June 13, 1984, he was with Ballard, at her apartment. He briefly left with Jordan Moss, but returned at approximately 10:45 p.m. Only defendant, Ballard, and her son were in the apartment. He and Ballard smoked two marijuana cigarettes. An argument ensued between defendant and Ballard regarding defendant's brother, Ballard's boyfriend. At some point, Ballard retrieved a knife

from underneath the mattress of her bed and swung it at defendant. Defendant grabbed Ballard's hand. Both he and Ballard had their hands on the knife. Defendant started pushing the knife toward Ballard, and the knife went into her. In the continuing struggle, defendant stabbed Ballard in the chest. Defendant went home. He told his brothers Antoine and Ronald and his sister Olivia that the blood on his clothes resulted from a fight. He took his clothes off and tried to wash the blood out.

Here, defendant argues his statement placed the knife in Ballard's hands throughout the struggle and otherwise indicated Ballard was the aggressor. Defendant therefore contends he was not proven guilty beyond a reasonable doubt because the State failed to prove the requisite mental state for murder.

■■■ ■ We do not agree. Intent may be inferred from the character of a defendant's actions and the circumstances surrounding the commission of the offense. (*People v. Terrell* (1989), 132 Ill. 2d 178, 547 N.E.2d 145, *cert. denied* (1990), 495 U.S. 959, 109 L. Ed. 2d 749, 110 S. Ct. 2567.) In addition to his statement, the record contains sufficient evidence supporting the inference that defendant possessed the requisite mental state to support a murder conviction.

The testimony of Dr. Eupil Choi, the medical examiner who performed the autopsy on Ballard, established the nature and extent of Ballard's stab wounds. His testimony, alone, is sufficient to support the inference of intent.

Ballard suffered a total of 26 stab wounds. Five of the wounds were to her back. Three of those wounds were deep enough to penetrate her lungs. Additionally, Assistant State's Attorney Frank Gaughan testified at trial that defendant had represented orally to him that he had obtained control of the knife in the bedroom and had followed after Ballard out of the room. Viewing that evidence in a light most favorable to the State, we conclude defendant was proven guilty of murder beyond a reasonable doubt. *People v. Collins* (1985), 106 Ill. 2d 237, 478 N.E.2d 267, *cert. denied* (1985), 474 U.S. 935, 88 L. Ed. 2d 274, 106 S. Ct. 267.

## VIII

Following a sentencing hearing, the trial judge sentenced defendant to an extended-term prison sentence of 70 years, finding Ballard's murder resulted from "exceptionally brutal or heinous behavior indicative of wanton cruelty." Ill. Rev. Stat. 1983, ch. 38, par. 1005—5—3.2(b)(2).

Defendant now argues that his sentence was excessive in view of his age, family, and personal background, the circumstances of the crime, and the absence of any prior adult criminal convictions.

■■ We find no reason to disturb the sentence imposed by the trial judge. The evidence of the nature and extent of Ballard's stab wounds is sufficient to support defendant's extended-term sentence. The record indicates the murder scene was exceedingly bloody and that defendant used such force in stabbing Ballard that he broke the knife handle. The record contains no indication that the trial judge failed to consider all relevant factors mitigating against an extended term.

## IX

The record indicates that defendant was convicted of murder under both section 9—1(a)(1) and section 9—1(a)(2) of the Criminal Code of 1961 (Ill. Rev. Stat. 1983, ch. 38, pars. 9—1(a)(1), (a)(2)).

■■ Defendant points out that because he killed only one individual, one of the two convictions must be vacated. The State concedes the point and elects to retain the conviction pursuant to section 9—1(a)(1), based upon defendant's intent to kill or cause great bodily harm or knowledge that his acts would cause death. Because defendant raises no objection to the State's election, we vacate defendant's conviction under section 9—1(a)(2).

For the reasons above, we affirm defendant's conviction for murder pursuant to section 9—1(a)(1) and his sentence and vacate defendant's conviction pursuant to section 9—1(a)(2). As part of this judgment, we also grant the State's request that the defendant be assessed $75 as costs for the State's defense of this appeal.

Affirmed in part and vacated in part.

CAMPBELL and BUCKLEY, JJ., concur.